UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MACHELLE CARDENAS, an individual,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN AIRLINES, INC., a Texas corporation; AMERICAN AIRLINES GROUP, INC., a publicly traded Delaware corporation; Tony LNU, an individual; and DOES 1 through 100,<br><br>Defendants. | Case No.: 17cv2513-GPC(JLB)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR RECONSIDERATION**<br><br>[Dkt. No. 45.] |

Defendant American Airlines, Inc. filed a motion for reconsideration of the Court's order granting in part and denying in part its motion for summary judgment filed on April 3, 2019, (Dkt. No. 44). (Dkt. No. 45.) Plaintiff Machelle Cardenas filed an opposition and Defendant replied. (Dkt. Nos. 48, 49.) The Court finds that the matter is appropriate for decision without oral argument pursuant to Local Civ. R. 7.1(d)(1). Based on the reasoning below, the Court GRANTS in part and DENIES in part Defendant's motion for reconsideration.

////
////
////

**Background**[1]

On April 30, 2018, Plaintiff Machelle Cardenas ("Plaintiff") filed the operative first amended complaint ("FAC") against Defendants American Airlines, Inc. ("Defendant" or "AA") and American Airlines Group, Inc.[2] alleging wrongful refusal to transport pursuant to the Federal Aviation Act, 49 U.S.C. § 44902(a)(1), breach of contract, negligence, assault and battery, false imprisonment and intentional infliction of emotional distress for excluding her from a flight at the Dallas/Fort Worth ("DFW") airport and then cancelling future flight reservations and temporarily barring her from buying any tickets without justification. (Dkt. No. 18, FAC.)

On August 27, 2017, Plaintiff and her son were traveling on an American Airlines flight from San Diego, CA to Washington D.C. with a connection at the DFW airport. (Dkt. No. 43, P's Suppl. Response to SSUF, Nos. 1, 7.) During the flight from San Diego to DFW, passengers were told the airport had shut down due to a hurricane coming in and their flight was in a holding pattern until they were able to land. (Id., No. 2.) The flight arrived about 2 hours late and Plaintiff and her son missed their connecting flight. (Id., No. 3; Dkt. No. 40-2, Menck Decl., Ex. A, Cardenas Depo. at 17:2-12.)

While Plaintiff and her son were waiting in line at DFW to rebook their connecting flight, an American Customer Service Manager, Tony Redelfs ("Redelfs"), was passing out cards to passengers in line instructing them to call the number to get help to get on the next flight out. (Dkt. No. 43, P's Suppl. Response to SSUF, No. 7.) Plaintiff called the number and was booked on the next flight. (Id., No. 8.) The person on the phone that re-booked the flight told Plaintiff to remain in line so she could make sure AA knew where her luggage was going. (Id., No. 9.) Plaintiff claims she stood in line for 30 to 45 minutes before leaving the line to approach Redelfs. (Id., Nos. 10.) Plaintiff testified she

---

[1] The facts are taken from the Court's order on summary judgment. (Dkt. No. 44.)
[2] American Airlines Group, Inc. is a named defendant, and has not appeared in this case. It is not clear whether American Airlines Group, Inc. has been served.

approached the counter at Gate A-20 where Redelfs was helping another customer. (Id., No. 11.)

At this point, the parties' facts differ on how Plaintiff approached Redelfs. Plaintiff testified she waited for a break while Redelfs was helping a customer and then touched Redelfs on the shoulder to get his attention, saying, "[e]xcuse me, can you help me?" (Id., No. 12.) She continued with, "You said you would send over some agents and nobody's came (sic). It's been 45 minutes. Can you help us?" (Dkt. No. 40-2, Menck Decl., Ex. A, Cardenas Depo. at 31:12-19.) While she was talking, Redelfs did not look up, kept typing and asked if she had a ticket. (Id. at 31:19-24.) Plaintiff then gave him her ticket and he said, "You're no longer flying on American. You just assaulted me." (Id.) He also said "See all these cameras? You're getting videotaped. And you just assaulted me." (Id. at 32:7-9.) Redelfs told the agent next to him to "[c]all security" but the female agent looked up, looked at him, looked at Plaintiff and went back to what she was going. (Id. at 32:4-6.) Redelfs turned to the agent again and said "I told you to call security" and she slowly picked up the phone and called security. (Id. at 32:4-6; 12-15.) Redelfs told her, "You cannot go anywhere. You need to stay right here. You're getting arrested." (Id. at 33:2-4.) Plaintiff stated that she begged him and cried stating she was traveling with her son. (Id. at 32:16-19.) Two minutes later security arrived. (Id. at 33:23-25.) Plaintiff testified that nobody told her that she was not flying because it would be inimical to the safety of the aircraft or that she was unfit to fly. (Id. at 55:13-23.)

In contrast, Redelfs testified that Plaintiff approached his left side, grabbed his arm, spun him to face her and said "you lied to me; You said you were going to get more people here." (Dkt. No. 40-2, Menck Decl., Ex. B, Redelfs Depo. at 56:11-17.) He said that he next asked for her boarding pass and then he told her she would not be flying with AA because what she did constituted assault. (Id. at 56:19-21.) Redelfs testified that he did not call the DFW police and it was the agent at the gate with him that called on her own. (Id. at 23:13-25.)

3

The Passenger Name Record, ("PNR"), written by Redelfs contemporaneously or shortly after the incident states, "Customer became irate and approached me and shoved me due to being upset at the service center line. Reservation cancelled." (Dkt. No. 40-2, Menck Decl., Ex. B at 207[3]; id., Ex. B., Redelfs Depo. at 50:20-22.)

Plaintiff's reservation was canceled and her ticket was subsequently placed in "no-go" status which means she could not use her ticket any more but she could have gotten another ticket to fly out of DFW. (Dkt. No. 40-2, Menck Decl., Ex. B, Redefls Depo. at 32:1-7; 91:14-20; Dkt. No. 43, P's Supp. Response to SSUF, No. 33.) Redelfs explained that he has the authority to cancel a flight but is unable to put somebody on the no-go list; instead, he needs approval from the System Customer Service Manager, ("SCSM") who is in DFW but not on the airport property. (Dkt. No. 40-2, Menck Decl., Ex. B, Redelfs Depo. at 58:11-21; 59:19-60:1.) During the incident, Redefls called and told the SCSM what happened. (Id. at 60:2-25.) The SCSM also reviewed the PNR that Redelfs wrote. (Id.) After hearing what happened from Redelfs and reviewing the PNR, the SCSM put Plaintiff's ticket in no-go status. (Id.) At his deposition, Redelfs testified that he believed that she was dangerous to other passengers because she could not control her emotions or behavior. (Id. at 75:19-24.)

In an incident report dated October 5, 2017, a little over a month after the incident, Redelfs wrote,

> Customer was in line at the A service center. After handing out the RICAP cards, I assisted another customer at the front of the line with her connection through London to Frankfurt. I asked her to come with me to the A20 gate counter to get her information. While I was working with her reservation, Mrs. Cardenas grabbed my left arm and spun me around to face her, put her finger in my face, and yelled at me. She said that I lied to her, and that I said I would bring more agents over, but did not. Instead, she alleged I was just bringing random people over to A20 to help them and letting people jump the line. At that point, I explained that she would not be travelling, as what she had done constituted assault. She began to cry and sat down in the gate

---

[3] Page numbers are based on the CM/ECF pagination.

> area. DPS responded and spoke to her, but to my knowledge, did not make a report. Customer apologized profusely, but I still did not let her travel. I called the SCSM and had her ticket placed in No Go Status.

(Dkt. No. 40-2, Menck Decl., Ex. B at 226.)

A couple of minutes after the incident, two female officers from the Dallas Fort Worth Police Department arrived at the scene. (Dkt. No. 43, P's Suppl. Response to SSUF, No. 19.) The officers were cordial and did not ask for Plaintiff's ID. (Id., No. 20.) Plaintiff testified that she told the officers her story and they said they were going to speak with Redelfs. (Id., No. 21.) Plaintiff testified that the two officers left her to speak with Redelfs and they were gone for two to three minutes. (Id., No. 22.) Plaintiff testified that after speaking with Redelfs, the police told her, "He's not going to have you arrested, but you're not going to fly on that flight. You're not flying on American." (Id., No. 23.) Plaintiff testified that the officers told her, "go to the gate with your son. See if you can get on the plane, explain to the gate agent what happened or to another customer service . . . ." (Id., No. 24.) When Plaintiff arrived at the gate at Terminal C with her son, she testified that she was told that the agent could not get into her record and her whole itinerary was cancelled. (Id., No. 25.) The agent told her to exit security, go downstairs and buy another ticket on the flight as there were plenty of seats. (Dkt. No. 40-2, Menck Decl., Ex. A, Cardenas Depo. at 43:6-22.) Plaintiff then went downstairs to buy another ticket but the agent there told her that her account was locked out. (Id. at 44:1-4.) The agent made a phone call to Redelfs and told her "You're not going to be flying tonight. And I can't get you a ticket for tomorrow either. Your account's locked, and the agent's not changing his mind." (Id. at 44:5-14.)

Plaintiff then called to buy another ticket with another airline but was not successful as there no more flights to Washington D.C. that evening. (Dkt. No. 40-2, Menck Decl., Ex. A, Cardenas Depo at 46:3-22.) She went to a hotel and could not sleep and around 2:00 a.m. she was able to login to her AA account, booked a flight at 6:00

5

a.m. and successfully boarded the flight and arrived in Washington D.C. (Id. at 47:19-48:16.)

On April 3, 2019, the Court granted in part and denied in part Defendant's motion for summary judgment. (Dkt. No. 44.) Specifically, the Court granted summary judgment on the causes of action for violation of 49 U.S.C. § 44902(b) of the Federal Aviation Act ("FAA"), breach of contract, and assault and battery but denied summary judgment on the claims for negligence, false imprisonment, intentional infliction of emotional distress as not field preempted by the FAA and punitive damages. (Id. at 18[4].)

## Discussion

**A.  Legal Standard on Motion for Reconsideration**

A motion for reconsideration, under Federal Rule of Civil Procedure 59(e), is "appropriate if the district court (1) is presented with newly discovered evidence; (2) clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." Sch. Dist. No. 1J, Multnomah County, Or. V. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993); see also Ybarra v. McDaniel, 656 F.3d 984, 998 (9th Cir. 2011).

The Court has discretion in granting or denying a motion for reconsideration. Fuller v. M.G. Jewelry, 950 F.2d 1437, 1441 (9th Cir. 1991). A motion for reconsideration "may *not* be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." Kona Enters., Inc. v. Estate of Bishop, 229 F.3d 877, 890 (9th Cir. 2000) (emphasis in original).

Defendant moves for reconsideration on the Court's order on summary judgment arguing the Court committed clear error in holding that the state law claims are not preempted by 49 U.S.C. § 44902(b) of the FAA and denying summary judgment on the issue of punitive damages.

---

[4] Page numbers are based on the CM/ECF pagination.

**B.     FAA Preemption of State Law Claims**

AA argues that the Court erred in concluding that the FAA did not preempt the state law causes of action because the Court required AA to demonstrate that Plaintiff was denied boarding for reasons related to safety and it relieved Plaintiff of her burden to show that AA did not reasonably believe she might be inimical to safety under § 44902(b). Instead, AA argues it was Plaintiff's burden to show that AA did not reasonably believe she was or might be inimical to safety and she failed to produce any evidence that Redelfs or the SCSM reasonably held this belief. In response, Plaintiff argues the Court correctly determined that state law claims were not preempted by the FAA because AA did not remove her for safety reasons.

Congress has the power to preempt state law. U.S. Const. Art. VI, cl. 2; Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992). Congress may preempt state law expressly or impliedly. Id. Under implied preemption, there is conflict preemption and field preemption. Conflict preemption occurs when a state law "actually conflicts with federal law or when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting the federal law." Montalvo v. Spirit Airlines, 508 F.3d 464, 470 (9th Cir. 2007). "[F]ield preemption occurs when Congress indicates in some manner an intent to occupy a given field to the exclusion of state law." Id. There is a presumption that federal preemption does not apply and the party seeking to assert preemption bears the burden to show that was the "clear and manifest purpose of Congress." Wyeth v. Levine, 555 U.S. 555, 565 (2009).

The Ninth Circuit has held that through implied field preemption, Congress intended to preempt all state law in the "entire field of aviation safety." Montalvo v. Spirit Airlines, 508 F.3d 468, 471 (9th Cir. 2007) ("The Federal Aviation Act has no express preemption clause."). In subsequent opinions, the Ninth Circuit narrowed the breadth of the FAA's preemption analysis in Montalvo stating it is not "broadly field-preemptive of state tort suits." Gilstrap v. United Air Lines, Inc., 709 F.3d 995, 1004

1  (9th Cir. 2013) (citing Martin ex rel. Heckman v. Midwest Exp. Holdings, Inc., 555 F.3d
2  806, 810 (9th Cir. 2009)).

3  Under the FAA, Congress made it a federal policy to assign and maintain safety
4  "as the highest priority in air commerce." 49 U.S.C. § 40101(a)(1). The FAA provides
5  that air carriers "may refuse to transport a passenger or property the carrier decides is, or
6  might be, inimical to safety." 49 U.S.C. § 44902(b). The carrier's discretion is
7  extremely broad under § 44902(b). Cerqueira v. American Airlines, Inc., 520 F.3d 1, 12
8  (1st Cir. 2008).

9  Here, Defendant disagrees with the Court's conclusion in this paragraph,

> In this case, it is not disputed that if Defendant's conduct of placing Plaintiff in "no go" status was due to airline safety reasons, Plaintiff's state law claims would be preempted. But Plaintiff argues that Defendant's actions were not due to safety reasons. The Court agrees. The facts surrounding the incident and the conduct of Redelfs and the SCSM do not demonstrate that they precluded Plaintiff from flying due to safety reasons. Defendant's citation to cases where the court held the state law claims were preempted are not supportive because in those cases, it was clear that the passengers were removed due to safety reasons.

(Dkt. No. 44 at 10.) Defendant argues that the Court improperly placed the burden on AA to demonstrate that Plaintiff was denied boarding for reasons related to safety and it relieved Plaintiff of her burden to show that American did not reasonably believe she might be inimical to safety.

The Court disagrees. The Court did not require AA to prove Plaintiff was denied boarding due to safety reasons but in determining whether preemption applies, an issue of law, the Court considered, as a threshold issue, whether Plaintiff's claims implicate airline safety, and not whether the standard of § 44902 had been met. See Mercer v. Southwest Airlines Co, Case No. 13cv5057-MEJ, 2014 WL 4681788, at *4 (N.D. Cal. Sept. 19, 2014) ("Thus, the question becomes whether Plaintiff's claims directly implicate airline safety."). In Mercer, the plaintiff was explicitly told that the captain did not want

him on the plane because he considered him to be a security threat; therefore, it was apparent that his removal was due to safety reasons. Id. at *5.

"Martin and Montalvo stand for the proposition that while the state standard of care is preempted in the context of claims directly implicating airline safety, state laws and standards of duty apply to claims directed at matters not directly touching on airline safety or other fields with pervasive regulations." Keum v. Virgin America Inc., 781 F. Supp. 2d 944, 950 (N.D. Cal. 2011) ("Keum's tort claims do not clearly implicate airline safety"). In Keum, the plaintiff's tort claims were based on her allegation of verbal abuse and being punched in her shoulder by a flight attendant when she used the first-class restroom while seated in the coach section. Id. at 947. The flight attendant approached the plaintiff's seat, yelled at her for using the first-class restroom and then punched her shoulder, causing her to scream and her arm to feel numb. Id.

Based on the facts presented by both parties, the Court first determined whether § 44902(b) was even applicable and concluded that it was not apparent that Plaintiff's claims based on Redelfs' conduct of creating a PNR to bar Plaintiff from boarding the flight implicated airline safety.

The Court explained,

> The contemporaneous notes of the NPR states that Plaintiff's reservation was cancelled because she shoved Redelfs, not due to safety reasons. In the subsequent October 5, 2017 incident report, Redelfs wrote that Plaintiff grabbed his arm, spun him around to face her, put her finger in his face and yelled at him. There is no reference to a safety threat in the incident report. When the DFW police arrived a few minutes later and spoke with Plaintiff and Redelfs, the police officers told her she would not be arrested and told her to try to get on the plane by going to the gate agent. The DFW police's direction that she try to get on the flight demonstrates that she was not considered a safety threat. Furthermore, when she arrived at the gate, the agent, when she was unable to get into Plaintiff's account, assisted Plaintiff by telling her to go and buy another ticket on the same flight, which does not demonstrate she was a safety risk. Finally, the fact that Redelfs testified that she could easily have purchased another ticket refutes the argument that she was considered a safety threat. Accordingly, Defendant has not

9

17cv2513-GPC(JLB)

> demonstrated that the SCSM's decision to put Plaintiff in no-go status was due to safety concerns.

(Dkt. No. 44 at 11.) Based on the evidence, the Court concluded the SCSM's decision to put Plaintiff's ticket in no-go status was not due to safety concerns and, thus, did not fall within FAA's field preemption of aviation safety. Therefore, the Court did not conduct an analysis of § 44902(b). See Adams v. U.S. Airways Grp., Inc., 978 F. Supp. 2d 485, 496 (E.D. Pa. 2013) (allegations of mistreatment by flight attendants do not implicate aviation safety, and therefore, a claim premised on such facts does not fall within the scope of the FAA's broad preemption).

The cases AA cites to support its position are not persuasive. For example, in Cintron v. JetBlue Airways Corp., 324 F. Supp. 3d 248, 250-51 (D. Mass. 2018) which AA argues is most factually on point, the plaintiff was escorted off a flight when she tapped the flight attendant on the back and the captain told her that the reason he was removing her from the flight was because the flight attendant did not like being touched. First, in Cintron, the defendant asserted preemption under the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713, which contains an express preemption provision if related to "price, route, or service." Id. at 252. In Cintron, because the incident arose out of a "boarding procedure" and falls under "service, the plaintiff's claims were expressly preempted. Id. at 254. The court then addressed whether the airline may be immune from liability under § 44902(b) and conducted an analysis on its application. Id. at 254-55. In that analysis, the court noted that the discretion granted to the captain is extremely broad and he is entitled to rely on information provided to him by his crew even if exaggerated or false. Id. at 254. The court concluded that the captain's decision to remove Plaintiff was not arbitrary or capricious. Id. at 255. The district court also asserted that the captain's reasons for removing the plaintiff was safety related. Id. at 254.

In Shaffey, the Ninth Circuit held that the plaintiff's state law claims were preempted because the FAA occupies the entire field of aviation safety and because her claims directly implicate the pilot's decision to remove her from the flight for safety reasons. Shaffey v. United Airlines, 360 Fed. App'x 729, 730-31 (9th Cir. 2009) (unpublished). In Shaffey, the plaintiff repeatedly removed her dog from its container contrary to the flight attendant's directions not to. Id. at 730. After receiving a number of calls from different flight attendants about the plaintiff's conduct of removing her dog from its container, the captain decided the dog presented a safety issue because it "could bite a passenger or upset passengers or crew members by urinating or defecating on them. The captain also concluded that [the plaintiff] presented a potential safety risk because of her failure to obey crew instructions. The captain decided to have [the plaintiff] removed from the flight when it made a scheduled stop in Las Vegas." Id.

In Register v. United Airlines, Inc., Case No. 16cv2480-W(BGS), 2017 WL 784288 (S.D. Cal. Mar. 1, 2017), the court held that the FAA preempted all state law impinging upon the circumstances under which an air carrier may remove a passenger from a flight for safety reasons based on the fact that the captain diverted the aircraft because of a "situation" onboard which requires an inquiry into the "federally occupied field of flight safety." Id. at *3.

First, these cases implicated a safety risk that was communicated to the captain and involved a captain's decision to deny passage to these passengers. Courts have routinely held that the captain or pilot of an aircraft has broad discretion to rely on information of the flight crew to make a determination whether a passenger poses a safety risk. See Doe v. Delta Airlines, Inc., 129 F. Supp. 3d 23, 39 (S.D.N.Y. 2015) ("[S]ince the captain is in command of the aircraft but he has less intimate interactions with passengers than his crew, a 'captain of an airplane is entitled without further inquiry to rely upon a flight attendant's representations that a . . . passenger might distract the flight attendant from performing his or her safety-related duties.'"); Mercer, 2014 WL 4681788, at *5 ("Defendant has it right that whether or not the captain was *correct* in his belief that

Plaintiff posed a security threat, the fact that the safety of the flight was in question at the time Defendant acted is what is relevant to this analysis.").

In Cintron the court noted that "the determination whether a passenger is inimical to safety is made by the captain, who is the final authority as to the operation of the aircraft and stands in the role of the air carrier for a decision to remove a passenger from a flight." Cintron, 324 F. Supp. 3d at 255 ("Even though the flight attendant's conduct may have been callous and unprofessional, and even though he may have exaggerated or misrepresented facts to the captain, the captain was allowed under the statute to take the flight attendant's words at face value."). In Cerqueira, the court noted that in addition to § 44902(b), the regulation provides that the "the pilot in command stands in the role of the air carrier for a decision to remove a passenger from a flight," citing 14 C.F.R. § 91.3(a)). Cerqueira, 520 F.3d at 12-13 (noting that the authorization in § 44902(b) also applies to decisions by others than the pilot). This deference to air carriers has been granted because the removal decisions are usually made "on the spur of the moment, shortly before the plane takes off, and therefore without the benefit of complete and accurate information." Doe, 129 F. Supp. 3d at 39. In this case, Redelfs' PNR did not communicate Plaintiff's safety risk to the SCSM and consequently, it is not apparent that the placement of Plaintiff's ticket in "no go" status by the SCSM was safety related.

Furthermore, upon further review of the legal authority, the Court questions whether § 44902(b) applies to a decision made by a SCSM during Plaintiff's attempt to confirm her luggage destination, and AA does not provide any legal authority to support its argument that § 44902(b) applies to a decision by a SCSM. See e.g., Elasaad v. Independence Air, Inc., 613 F.3d 119, 127 (3d Cir. 2010) (citing Abdullah v. American Airlines, Inc., 181 F.3d 363, 365 (3d Cir. 1999) (distinguishing the field preemptive law of "aviation safety" in Abdullah as limited to in-air safety)).

Finally, in Martin, the Ninth Circuit explained that the preemptive effect of the FAA stating "when the agency issues 'pervasive regulations' in an area, like [the] passenger warnings [at issue in Montalvo], the FAA preempts all state law claims in *that*

area. In areas without pervasive regulations or other grounds for preemption, the state standard of care remains applicable." 555 F.3d at 811. In Martin, a pregnant plaintiff and her fetus sustained injuries when she fell from an airplane's stairs. Id. at 808. The Ninth Circuit explained that because the FAA had not comprehensively regulated airplane stairs, the court held that the state tort claims involving airplane stairs were not preempted by federal law. Id. at 812. As described by one district court, "[t]he FAA's preemptive scope is coextensive with the pervasiveness of federal regulations in any particular area of law. In some areas without pervasive federal regulations, state standards of care may still apply." Register v. United Airlines, Inc., Case No., 16cv2480-W(BGS), 2017 WL 784288, at *2 (S.D. Cal. Mar. 1, 2017) (citing Martin, 555 F.3d at 808 and Ventress v. Japan Airlines, 747 F.3d 716, 721-22 (9th Cir. 2014)). The "essential field preemption inquiry is whether the density and detail of federal regulation merits the inference that any state regulation within the same field will necessarily interfere with the federal regulatory scheme." Parver v. Jet Blue Airlines Corp., 649 Fed. App'x 539, 543 (9th Cir. 2016) (quoting Nat'l Fed. Of the Blind v. United Airlines, Inc., 813 F.3d 719, 734 (9th Cir. 2016)). Therefore, the FAA does not preempt all state law personal injury claims related to aviation safety but only where there are "pervasive regulations in that area." Gilstrap, 709 F.3d at 1004.

Here, AA has failed to demonstrate that Redelfs and the SCSM's conduct of canceling Plaintiff's flight and placing her ticket on "no go" status is subject to pervasive regulations to support preemption. There is no indication that the FAA and its regulations intended to preempt state law claims alleging injury from an alleged misuse of authority by personnel at an airport. See Parver, 649 Fed. App'x at 543 ("regulations . . . do not amount to 'pervasive' regulations of passenger management with respect to Parver's claimed intentional tort [false arrest and false imprisonment] alleging injury from the misuse of authority.").

Defendant also argues that the Court erred because it did not consider Redelfs' deposition testimony and only considered contemporaneous statements in coming to its

13

17cv2513-GPC(JLB)

determination that the decision to refuse her boarding was not safety related. Yet, AA also argues that the reasonableness of a carrier's opinion is to be tested based on the information available to the airline at the moment the decision was made. (Dkt. No. 45 at 15.) AA's argument is refuted by its own statements. The Court found the evidence surrounding the incident more probative of the reasons why she was placed in "no go" status than Redelfs' deposition testimony taken months later. Moreover, even if the Court considered Redelfs' testimony, he only testified what he believed which was that Plaintiff was dangerous to others because she could not control her emotions. (Dkt. No. 37-4, Worthe Decl., Ex. C, Redelfs Depo. at 75:19-24; 79:5-9.) His testimony is not relevant to determining whether the SCSM's conduct in placing her in "no go" status was safety related. He did not testify that he informed the SCSM of his beliefs about her danger to others. Accordingly, AA's argument that the Court did not consider Redelfs' deposition testimony is not compelling.

Therefore, the Court concludes that Plaintiff's state law claims are not preempted by the FAA, and the Court DENIES Defendant's motion for reconsideration on the federal preemption issue.

Defendant also challenges the Court's ruling on the false imprisonment and intentional infliction of emotional distress claims arguing that the Court erroneously looked at Plaintiff' intent and not to Redelfs' reaction in determining whether an underlying battery occurred for purposes of these causes of action. AA argues that because Plaintiff committed an "assault" on Redelfs, he was justified in making a citizen's arrest and it was appropriate for him to call the police; therefore, there was no false imprisonment and relatedly no intentional infliction of emotional distress.

The "elements of a tortious claim of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however short." Fermino v. Fedco, Inc., 7 Cal. 4th 701, 715 (1994) (merchant's arrest). "Restraint may be effectuated by means of physical force, threat of force or of arrest, confinement by physical barriers or by means of any other

14

17cv2513-GPC(JLB)

form of unreasonable duress." Id. (internal citations omitted). "The length of time can be as brief as 15 minutes." Id. However, the 15 minutes asserted in Fermino was not meant to set a floor. Robles v. Agreserves, Inc., 158 F. Supp. 3d 952, 976-77 (E.D. Cal. 2016) (citing cases) (denying summary judgment as a jury will have to determine whether 2 to 3 minutes was an "appreciable period of time").

In its order, the Court concluded there was an issue of fact whether the 2 to 3 minute wait for the DFW police to arrive constituted an appreciable period of time, whether Redelfs was justified in effectuating a citizen's arrest based on the battery committed by Plaintiff and whether Plaintiff's touching was harmful or offensive and constituted battery on Redelfs. (Dkt. No. 44 at 14.)

California Penal Code section 837 provides that a private person may arrest another for a "public offense committed or attempted in his presence . . . ." Cal. Penal Code § 837. "[I]t would appear that a private citizen may arrest another when circumstances exist which would cause a reasonable person to believe a crime had been committed in his presence." People v. Burgess, 170 Cal. App. 2d 36, 40-41 (1959); Jack v. Rhay, 366 F.2d 191, 192 (1966) (a private person must have reasonable cause to believe that an offense has been committed).

Here, there is an issue of fact whether there was reasonable cause for Redelfs to believe that a battery had been committed by Plaintiff. On the battery claim, AA further contends that any non-consensual touching constitutes a battery and the Court should have looked at whether Redelfs believed the acts were harmful or offensive and not Plaintiff's intent. The Court disagrees.

Civil battery requires the following elements: "(1) defendant intentionally performed an act that resulted in a harmful or offensive contact with the plaintiff's person; (2) plaintiff did not consent to the contact; and (3) the harmful or offensive contact caused injury, damage, loss or harm to plaintiff." Brown v. Ransweiler, 171 Cal. App. 4th 516, 536-27 (2009); Rains v. Superior Ct., 150 Cal. App. 3d 933, 938 (1984) ("A battery is a violation of an individual's interest in freedom from intentional, unlawful,

harmful or offensive unconsented contacts with his or her person."). Battery is "committed if there is unwanted intentional touching of any kind." Conte v. Girard Orthopaedic Surgeons Med. Grp., Inc., 107 Cal. App. 4th 1260, 1266 (2003). Battery encompasses the "least touching"; it need not cause bodily harm, pain or even leave a mark so long as it is harmful or offensive. People v. Myers, 61 Cal. App. 4th 328, 335 (1998). Specific intent is not required for battery; it "only requires an intentional act and actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." People v. Hayes, 142 Cal. App. 4th 175, 180 (2006) (mental state for battery is same as for assault). Contrary to AA's argument, a finding of general intent for battery must exist, that is if "a reasonable person, viewing the facts known to defendant, would find that the act would directly, naturally and probably result in a battery." See id.

Here, Plaintiff claims she touched Redelfs' shoulder attempting to get his attention and denies having committed a battery. There is an issue of fact whether she knew her act of touching Redelfs would probably result in a battery. Accordingly, the Court DENIES AA's motion for reconsideration on the false imprisonment and intentional infliction of emotional distress claims.

**C.     Punitive Damages**

In its order, the Court concluded that Plaintiff had not demonstrated an issue of fact that Redelfs was an officer, director or managing agent denied summary judgment but Plaintiff raised an issue of fact whether Johannes Jayasuriya, Redelfs' supervisor and the SCSM, who allegedly implemented the "no go" status based on Redelfs' report was an officer, director or managing agent of AA.

A plaintiff is entitled to punitive damages when she can show by "clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."

16

17cv2513-GPC(JLB)

Cal. Civ. Code § 3294.[5]  When the defendant is a corporation, the evidence must demonstrate that an officer, director or managing agent of Defendant, with advance knowledge of the employee's unfitness, committed, consciously disregarded, authorized or ratified an act of malice, oppression or fraud.  Id.

In assessing whether an employee is an officer, director, or managing agent for purposes of section 3294, the California Supreme Court has taken a more narrow view of the term "managing agent" and held managing agents include "only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." White v. Ultramar, Inc., 21 Cal. 4th 563, 566-67 (1999).  A "managing agent" is one with substantial authority over [corporate policy]." Cruz v. HomeBase, 83 Cal. App. 160, 167-68 (2000) (section 3294 "avoids punishing the corporation for malice of low-level employees which does not reflect the corporate 'state of mind' or the intentions of corporate leaders.").

In its reconsideration motion, AA argues that the Court erred by making a factual determination that it was Jayasuriya who placed Plaintiff ticket in a "no go" status.  AA asserts that it did not allege Jayasuriya was involved in the decision to place Plaintiff's

---

[5] Section 3294 provides,

(a) In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

(b) An employer shall not be liable for damages pursuant to subdivision (a), based upon acts of an employee of the employer, unless the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice. With respect to a corporate employer, the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice must be on the part of an officer, director, or managing agent of the corporation.

Cal. Civil Code § 3294.

ticket in no-go status, rather it was the SCSM who made the decision, and Jayasuriya was not mentioned in the complaint or even in Plaintiff's opposition.

The Court disagrees that Juryasuriya was not mentioned in the FAC or in Plaintiff's opposition. In fact, the Court relied on Plaintiff's representation in her opposition that, Jayasuriya, Redelfs' supervisor, was the SCSM who placed Plaintiff's ticket in a "no go" status or cancelled her future flights. (Dkt. No. 40 at 15.) Yet in reply, AA did not dispute this alleged assertion that Jayasuriya placed Plaintiff's in "no go" status. (Dkt. No. 41.) Moreover, the FAC alleges "Defendants, through their officers, managing agents and/or its supervisors, authorized, condoned and/or ratified the unlawful conduct complained of herein. As a result, plaintiff is entitled to punitive or exemplary damages from all defendant in a sum according to proof at trial." (Dkt. No. 18, FAC ¶ 73.) The FAC alleges that an officer, managing agent or supervisor of AA ratified Redefls' conduct.

However, on reconsideration, a review of the record demonstrates that Plaintiff did not support the fact that Jayasuriya was the SCSM who placed Plaintiff's ticket in a "no go" status with any evidence. In its opposition to summary judgment, Plaintiff also did not present any evidence to support the fact that the SCSM was an officer, director, or managing agent as defined under section 3294. Plaintiff does not address this issue in the opposition to the reconsideration motion. Because the Court erred in making that factual determination the Jayasuriya was the SCSM who placed Plaintiff's ticket in "no go status", the Court GRANTS Defendant's motion for reconsideration on the punitive damages and GRANTS summary judgment as to this relief.[6]

---

[6] In her opposition, Plaintiff argues that she is entitled to an adverse inference against AA due to spoliation of evidence related to the videotape of the incident and the inference satisfies Plaintiff's burden as to the state law causes of action and punitive damages. (Dkt. No. 48 at 5-8.) Defendant argues that the video is not properly before the Court and even if it were, it is not relevant to the issues on reconsideration. (Dkt. No. 49 at 6.) Typically, adverse inference instructions are provided to the jury at the end of trial and not at summary judgment. Ingram v. Pac. Gas & Elec. Co., 690 Fed. App'x 527, 530 (9th Cir. 2017) (citation omitted) (district court did not abuse its discretion by denying request for

**Conclusion**

Based on the above, the Court GRANTS in part and DENIES in part Defendant's motion for reconsideration. Specifically, the Court DENIES Defendant's motion for reconsideration on federal preemption and the state law causes of action, and GRANTS Defendant's motion for reconsideration on the punitive damages ruling.

IT IS SO ORDERED.

Dated: July 8, 2019

Hon. Gonzalo P. Curiel
United States District Judge

---

adverse inference on summary judgment). Moreover, an adverse inference ruling will involve resolving factual issues on whether AA failed to preserve the videotape and the Court does not have a complete factual record on this issue. Thus, the Court declines to consider the adverse inference argument in Plaintiff's opposition.